# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JUAN M. PEREZ and**
**SEAN P. TATE,**
        **Plaintiffs,**

**v.**                                      **Case No. 04-C-1181**

**MATTHEW J. FRANK, et al.,**
        **Defendants,**

---

## <u>DECISION AND ORDER</u>

Plaintiffs Juan M. Perez and Sean P. Tate are Wisconsin state prisoners and practicing Sunni Muslims who bring this civil rights action pursuant to 42 U.S.C. § 1983. Defendants are various state officials who work within the Wisconsin Department of Corrections ("DOC"). By order of November 2, 2005, the court screened plaintiffs' complaint pursuant to 28 U.S.C. §1915A and granted their petitions for leave to proceed in forma pauperis on claims under the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc. Plaintiffs seek to compel defendants to accommodate their religious beliefs by allowing them to possess certain items of religious property. In addition, Tate seeks a religious diet and an alternative to a test for tuberculosis that contains pork. Presently before me are the parties' cross-motions for summary judgment, as well as a pro se objection filed by Tate concerning his lawyer's arguments, and his counsel's corresponding motion to withdraw. I begin with the parties' cross-motions for summary judgment.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." Id.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. Id. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. Id. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, Anderson, 477 U.S. at 248, or upon conclusory statements in affidavits, Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (1989). In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, it is "not

2

required to draw every conceivable inference from the record - only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, Anderson, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. Id. at 248.

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. See 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 at 327-28 (3d ed. 1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. See Mitchell v. McCarty, 239 F.2d 721, 723 (7th Cir. 1957). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. Id. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. Id.

3

## II.  DISCUSSION

**A.     RLUIPA**

**1.        RLUIPA Legal Standard**

RLUIPA prohibits the government from imposing a "substantial burden on the religious exercise" of an inmate unless the government demonstrates that the burden is: (1) in furtherance of a compelling governmental interest, and (2) the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a).  In litigating a RLUIPA claim, the plaintiff bears the burden of establishing that the government has imposed a substantial burden on his or her religious exercise.  42 U.S.C. § 2000cc-2(b).  Under the statute, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  However, a religious belief must be sincerely held in order to receive protection under RLUIPA.  See Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)("Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . . the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity.").

RLUIPA does not define "substantial burden."  However, the Court of Appeals for the Seventh Circuit has, in the land use context, held that the government imposes a substantial burden on religious exercise if its action  "necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."  Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003).  In applying this definition of "substantial burden" to prisoner litigation, the Seventh Circuit stated that "[i]n determining whether an exercise has become 'effectively

4

impracticable,' it is helpful to remember that in the context of the Free Exercise Clause, the Supreme Court held that a government imposes a substantial burden on a person's beliefs when it 'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs.'" Koger v. Bryan, 523 F.3d 789, 799 (7th Cir. 2008) (quoting Thomas v. Review Bd., 450 U.S. 707, 718 (1981)).

If the plaintiff discharges his or her burden to show that the government has substantially burdened religious exercise, the burden of persuasion shifts to the government to come forward with evidence demonstrating that the challenged practice furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-2(b); Koger, 523 F.3d at 796.

## 2.      Perez and Tate's RLUIPA Claims Regarding Religious Property

Plaintiff Perez seeks four types of religious property: a turban, a thawb (prayer robe), khuffs (leather socks), and a miswak (toothstick).  Plaintiff Tate also seeks a turban and a thawb, and brings an additional claim for a silver ring.  At their depositions, plaintiffs testified that they seek these items in order to emulate the Prophet Muhammad.  Plaintiffs testified that under their interpretation of Islam, emulating the Prophet will result in additional blessings and increase the chances of their prayers being answered. Defendants concede that plaintiffs' requests for these items are motivated by sincerely held religious beliefs.  (Defs.' Br. in Opp. at 2 n.3.)

Although defendants concede that plaintiffs' requests are motivated by sincere religious beliefs, defendants argue that plaintiffs' requests are not protected by RLUIPA because their beliefs are not compelled by the tenets of Islam.  Defendants argue that

5

plaintiffs can be practicing Muslims in good standing even if they do not possess the items they request. They argue that possession of the items is optional. However, it is well established that "under RLUIPA, '[t]he term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" Koger, 523 F.3d at 797 (quoting 42 U.S.C. § 2000cc-5(7)(A)). Thus, plaintiffs need not establish that the Islamic faith requires that they possess and use these items. All that matters is that plaintiffs sincerely believe that their prayers are more likely to be rewarded if they possess the requested items and use them to emulate the Prophet.

Defendants also argue that plaintiffs are required to produce "objective evidence" showing that they cannot emulate the Prophet without the items they request. (Defs.' Reply Br. at 3.) It is not clear what defendants mean. As I just explained, plaintiffs need not show that their interpretation of Islam comports with some objective manifestation of the faith. What matters is what plaintiffs sincerely believe. If plaintiffs sincerely believe that Islam requires that they perform certain rituals, then RLUIPA applies to their requests for any religious items required to perform the rituals, even if other Muslims deem the items optional. Accordingly, because plaintiffs need only prove what they sincerely believe, rather than what other Muslims believe, plaintiffs need not produce "objective evidence" to support their beliefs. Plaintiffs' own (i.e., subjective) testimony, if credited by the finder of fact, would be enough to establish that they cannot exercise their religion without the requested items.

Here, plaintiffs have testified that they cannot observe their faith without the requested items. A total ban on the requested items is, as a matter of law, a substantial burden on a religious exercise that cannot be performed without such items. It follows that

6

plaintiffs have carried their burden to raise a genuine issue of material fact as to whether defendants' actions in prohibiting such items imposed a substantial burden on their religious exercise. I turn next to an analysis of each requested item to determine whether defendants have shown that the complete prohibition of each item is the least restrictive means of furthering a compelling governmental interest.

### a. Turban/Kufiyya (Perez and Tate)

Plaintiff Perez seeks to wear a turban in order to emulate the Prophet Muhammad and believes that his prayers are more likely to be answered if he does so. (Perez Dep. 36:5-6; 37:10-18.) Plaintiff Tate wishes to wear either a turban or a kufiyya[1] in order to imitate the Prophet Muhammad and receive blessings. (Tate Dep. 33:13-15; 34:21-35:14.) Defendants argue that plaintiffs' claims for these items fail because compelling security interests justify their denial. Specifically, defendants contend that a turban or kufiyya could be made into a rope and used to escape, and also could be used to conceal an inmate's identity or conceal contraband.

Plaintiffs argue that a total ban on turbans and kufiyyas is not the least restrictive means of ensuring that they are not used as escape devices, and that the compelling interest in preventing escapes would be satisfied by limiting the length of these items. Defendants' security expert, Captian Bruce Muraski, opines that a turban could be used as an escape device because a turban can be up to fifteen yards long. He notes that institutions will not permit inmates to possess items longer than six feet. (Muraski Dep. Ex.

---

[1]A kufiyya is "a head scarf, a rectangular piece of cloth of linen or silk in various colors, almost a yard square, worn by both sexes in the Arab East." The Encyclopedia of Islam 303 (New Edition 2009) (Index Volume).

7

1 at p. 2.) Plaintiffs argue that the least restrictive means of furthering this security interest is to restrict the length of turbans to under six feet. Defendants offer no response to this suggestion, and thus I could find that, as a matter of law, defendants have failed to meet their burden to show that a total ban on turbans and kufiyyas is the least restrictive means of furthering their interest in preventing escapes. However, as discussed below, plaintiffs' request for turbans must proceed to trial for other reasons. Further, it is possible that, after hearing Muraski's testimony in person, a reasonable finder of fact could conclude that even turbans under six feet could be used to facilitate an escape. Therefore, although I could enter summary judgment on this issue, I will leave it open for trial.[2]

Next, defendants argue that turbans could be used to conceal an inmate's identity and/or to conceal contraband. With respect to concealing identity, defendants argue that if inmates were permitted to wear turbans throughout the prison, it would be harder for witnesses to a prison incident (such as a beating) to identify the inmates involved in the incident before they disperse. (See Muraski Dep. at 61:9 - 63:14.) That is, if a fight broke out among a group of inmates wearing turbans on their way to a religious assembly, the

_____

[2]As the comments to the 2007 amendments to Federal Rule of Civil Procedure 56 make clear, district judges may decline to enter summary judgment on a claim even where there are no genuine issues of material fact. Although this discretion should be used sparingly, I find that its use is appropriate in the present case because the cold paper record may not fully reveal the extent of defendants' security interest in banning the requested items. After the court hears live testimony (and asks its own questions of the witnesses, if necessary), it will be in a better position to more intelligently weigh plaintiffs' interests in religious liberty against defendants' interests in security. See 11 James Wm. Moore et al., Federal Practice & Procedure § 56.32[6] (3d ed. 2007) ("If questions of inference are not completely settled as questions of law, a denial or deferral of summary judgment may improve adjudication in certain unusual cases."). This approach is in accord with the Supreme Court's statement that "prison security is a compelling state interest, and . . . deference is due to institutional officials' expertise in this area." Cutter, 544 U.S. at 725 n.13.

guards might not be able to identify the perpetrators. Plaintiffs argue that this fear is exaggerated and that standard-issue prison clothing could be used as easily as a turban to conceal a person's identity. However, plaintiffs have offered no expert testimony regarding the needs of prison security. The need to easily identify inmates would seem to be a compelling security interest, and an ordinary finder of fact would not necessarily be able to determine without the assistance of expert testimony whether turbans would present a serious obstacle to identification. Nonetheless, it is defendants that have the burden to show that a complete ban on turbans is necessary to further this security interest. Defendants have offered Muraski's expert testimony, but the finder of fact may find that Muraski lacks credibility or that his conclusions are not well-supported, and that therefore defendants have not carried their burden. Thus, in order to prevail on this claim, plaintiffs need not produce their own expert testimony and may rest on their challenge to Muraski's credibility.[3] Accordingly, neither party is entitled to summary judgment on this claim.

Defendants' final reason for prohibiting turbans is that they could be used to conceal contraband. Plaintiffs again respond by noting that contraband could be concealed in

---

[3]Defendants argue that plaintiff may not simply attack their expert's credibility but must produce independent proof showing that turbans would not impede identification. In support of this argument, defendants cite Springer v. Durfinger, where the court held that a plaintiff will not survive summary judgment if he fails produce evidence of his own and relies exclusively on challenges to the credibility of the defendant's witnesses. 518 F.3d 479, 484 (7th Cir. 2008). The flaw in defendants' argument is that in the present case, unlike in Springer, it is defendants who bear the burden of proving that they have chosen the least restrictive means of furthering a compelling governmental interest. Thus, it is defendants, not plaintiffs, that must come forward with evidence from which a reasonable finder of fact could return a verdict in their favor. Because plaintiffs need show nothing more than that defendants have not carried their burden, they are entitled to rest on challenges to the credibility of defendants' witnesses.

9

standard-issue prison clothing just as easily as in a turban, and that therefore a turban does not impose an undue security risk. Again, however, whether turbans present a greater risk of concealment than ordinary prison clothes is a matter on which expert testimony would be helpful. It is Muraski's opinion that turbans pose a greater security risk than ordinary clothes. Plaintiffs argue that Muraski does not adequately explain his conclusion, but whether his conclusion is credible is an issue for the finder of fact. (Plaintiffs do not argue that any of Muraski's testimony is inadmissible under Federal Rule of Evidence 702.) Accordingly, plaintiffs' claims for a turban or kufiyya must proceed to trial.

### b. Thawb (Perez and Tate)

A thawb is an ankle-length garment similar to a robe. <u>See</u> <u>The Encyclopedia of Islam</u> 552 (New Edition 2009) (Index Volume). The individuals in the image below are wearing thawbs.[4]



---

[4]This image is not in the record, and I do not know whether the thawbs in the image are representative of those that plaintiffs seek. I include the image only to help the reader get a general idea of what a thawb looks like.

10

Plaintiff Tate wants to wear a thawb during prayer because the Prophet wore a religious robe when praying. (Tate Dep. 39:17-40:4.) Plaintiff Perez also seeks to wear a long robe during prayer because he believes that Muslims should wear multiple layers of clothing during prayer and that his failure to wear a robe will contribute to the failure of his prayers. (Perez Dep. 48:20-49:8.) From their deposition testimony, in which plaintiffs state that they wish to wear thawbs "during prayer," I infer that plaintiffs seek to wear their robes only while in their cells or at group religious services. Defendants argue that compelling security interests justify the prohibition of thawbs. Specifically, defendants contend that thawbs could be used to conceal contraband or an inmate's identity, and that they could foster the ability of gangs to identify persons of authority.

Regarding defendants' claim that thawbs could be used to conceal contraband or identity, plaintiffs point out that inmates are allowed to wear bathrobes on their way to and from the showers, and they contend that defendants do not adequately explain why a monitoring policy similar to that used for bathrobes could not be used for thawbs worn to religious services, or why a thawb could not be carried to religious services and then worn under supervision, as is the practice with inmates participating in Native American sweat lodge ceremonies, who carry towels and sweat shorts to the sweat lodge. Defendants argue that thawbs are different from bathrobes, towels and sweat shorts because they have religious significance. Defendants state that inmates traveling in a group to a religious service may revolt if they see a guard searching an inmate's religious property. Specifically, defendants' expert on prison security testified about the difference between searching bathrobes and religious thawbs for contraband as follows:

11

There's a big difference the way they're going to react, what kind of reaction is going to come from the group as a whole when [a guard searches one inmate wearing a thawb on the way to religious services]. You're going to get a negative reaction from other inmates that are present. If there's 35 inmates present and one is wearing a robe, you single him out to search him, there's going to be an immediate reaction from the people that are accompanying him.

(Muraski Dep. at 68:18 - 69:13.)

In light of this testimony, the record does not allow me to conclude that there are no genuine issues of material fact concerning whether defendants' prohibition of thawbs is the least restrictive means of furthering their interest in preventing inmates from concealing their identity and/or contraband. As with turbans, a finder of fact could find Muraski's conclusions credible and thus find that thawbs pose a greater security risk than bathrobes or sweatclothes. Likewise, a finder of fact could disbelieve Muraski or find that his opinions lack support and conclude that defendants have failed to satisfy their burden to show that a total prohibition of thawbs is the least restrictive means of furthering this security interest.

Defendants' final reason for prohibiting thawbs is that they could be used to signify persons of authority within a gang. Plaintiffs express some confusion over what, exactly, defendants are concerned about here. (Pls.' Resp. to Defs.' PFOF ¶¶ 38-39.) Likewise, I do not know what defendants are talking about. Presumably, defendants' concern is that inmates will use thawbs to designate gang leaders, which in turn will facilitate gang activity within the prison. However, if this is defendants' concern, they have not articulated it in the record. Nonetheless, because plaintiffs' thawb claim will need to be fleshed out at trial for other reasons, I will refrain from entering summary judgment on defendants' purported interest in controlling gang activity. If they choose to do so, defendants may develop this issue at trial.

12

### c.      Khuffs (Perez Only)

Plaintiff Perez seeks to wear khuffs (leather socks) in order to emulate the Prophet Muhammad's method of purification.  According to Perez, the Prophet encourages Muslims to purify themselves before prayer by first washing their feet, then donning khuffs.  Should the person become impure before completing his prayer, he may simply wipe his feet over his khuffs rather than re-wash his feet.  Although Muslims are not required to wear khuffs and may simply re-wash their feet if they become impure, Perez believes that the Prophet prefers that khuffs be worn.  (Perez Dep. 55:15-56:14.)  Defendants contend that khuffs present security risks because they are double-stitched and an inmate could thus conceal contraband between the layers of stitching.  Defendants also contend that khuffs could be used as a means of identifying persons of authority in a gang.

Perez argues that contraband could be hidden in tennis shoes just as easily as khuffs, yet the prison permits tennis shoes.  Defendants respond that the prison regulates tennis shoes and prohibits those that have areas, other than the insole, that could be used to conceal contraband. (Muraski Dep. at 94:13-95:8.)  Defendants further state that it is very easy to search insoles of tennis shoes for contraband because insoles are easily removed.  (Id.)  Based on this record, I find that there is a genuine issue of material fact concerning whether a total ban on khuffs is the least restrictive means of furthering defendants' interest in prison security.  A finder of fact could credit Muraski's testimony that khuffs are more difficult to search than tennis shoes.  However, a finder of fact could also conclude that defendants' concerns about inmates using khuffs to conceal contraband are exaggerated.

Defendants' remaining interest in prohibiting khuffs is that they could be used to advertise persons of authority within a gang. Perez responds that he would wear his khuffs under his shoes, and that therefore his khuffs would not be seen by other inmates. Perez also states that inmates do not need special clothing to identify gang authority figures because such information is common knowledge. Again, I find that the record reveals a genuine issue of material fact. A finder of fact could reasonably conclude that khuffs could be used to advertise gang members even if they are worn under shoes, and that not all inmates will be able to recognize authority figures without some form of physical designation. However, a finder of fact could also conclude that if inmates were permitted to wear khuffs only in their cells and at religious ceremonies, the risk of facilitating gang activity would be eliminated. Therefore, I cannot enter summary judgment on this claim.

### d. Miswak (Perez Only)

In order to better emulate the Prophet, plaintiff Perez seeks a miswak, which is a kind of natural toothpick made from the twigs of certain trees. A typical miswak is about as long as the span of a person's outstretched hand. (Muraski Aff. ¶ 9.) The image below depicts a miswak.[5]



Perez believes that his inability to use a miswak contributes to the failure of his prayers. (Perez Dep. 43:9-13.)

---

[5]This image is not part of the record, and I include it here for illustrative purposes only.

14

Defendants argue that a miswak presents a security risk because an inmate could sharpen its end and use it as a weapon. However, defendants' security expert conceded that a miswak is no more dangerous than a pencil, and that inmates are allowed to possess pencils. (Muraski Dep. at 106:11-12.) Perez argues that a less restrictive alternative to an outright ban on miswaks would be to limit the number of miswaks and/or subject them to the general volume limitation on personal property that applies to pencils. Defendants do not identify any reason why they could not adopt this less restrictive alternative.

I find that defendants have failed to create a genuine issue of material fact as to whether an outright ban on all miswaks is the least restrictive means of furthering their interest in prison security. Defendants concede that miswaks are no more dangerous than pencils, and that inmates are allowed to possess pencils. They offer no evidence from which a reasonable finder of fact could conclude that miswaks present a greater danger than pencils. Rather, on the present record, it appears that the least restrictive means of furthering defendants' security interest is to subject miswaks to the same security limitations that apply to pencils. Nonetheless, I choose to exercise my discretion and allow this claim to proceed to trial. (See note 2, supra.) As is the case with turbans, live testimony might better illuminate any security concerns associated with miswaks, and therefore I do not want to resolve this issue as a matter of law based on the paper record alone.

15

**e.    Silver Ring (Tate Only)**

Plaintiff Tate seeks to purchase and wear at all times a silver ring inscribed with the word "Allah."  He believes that by wearing such a ring, he will better emulate the Prophet Muhammad and obtain additional blessings.   (Tate Dep. 37:13-38:11; 75:24-76:4.) Defendants argue that the denial of a silver ring is the least restrictive means to further compelling security interests.

Defendants first argue that if Tate's ring were large enough, he could use it as a weapon.  Defendants do not explain how an inmate would use a ring as a weapon, but the court can reasonably infer that defendants are concerned that a large ring might be used as a kind of "brass knuckle."  However, defendants allow inmates to possess wedding bands so long as they meet size limitations, and defendants do not explain why restricting the size of the Tate's ring to the maximum size allowed for wedding bands would not be sufficient to address security concerns.  Therefore, it would seem that, as a matter of law, a complete ban on religious rings is not the least restrictive means of furthering this particular interest.  Again, however, I will defer ruling on this issue until after I have heard live testimony.

Defendants next argue that allowing inmates to possess religious rings would present security concerns because it is difficult for staff to determine which inmates are allowed to possess rings.  Defendants explain that rings can be used as a form of currency within prisons, and that they are easy to steal and smuggle in and out of prisons during visitations.  Therefore, prison staff must be able to easily identify those inmates that are allowed to possess rings.  But again, inmates are allowed to wear wedding bands, and

defendants have not explained why religious rings could not be regulated in the same manner as wedding bands. To be sure, defendants assert in conclusory fashion that regulating religious rings in addition to wedding bands would be "extremely burdensome" (Defs.' Br. in Supp. at 12), but they do not explain what this extra burden would entail, and therefore they do not satisfy their burden to show that a total ban on religious rings is the least restrictive means of furthering the prison's interest in preventing the possession of illicit rings. RLUIPA imposes extra burdens on prisons for the sake of religious liberty, and thus a vague assertion that accommodating a religious practice would be "burdensome" cannot satisfy a prison's burden to show that they have employed the least restrictive means of furthering a compelling governmental interest. Accordingly, defendants have failed to show that a complete ban on religious rings is the least restrictive means of furthering defendants' interest in curbing the possession of illicit rings. Again, however, I will allow this claim to proceed to trial so that I may better understand any potential security issues.

Defendants next cite a prison policy that prohibits inmates from wearing religious emblems outside of their cells when they are not at religious services. Because Tate seeks to wear his ring "at all times" (Tate Dep. at 38:4-7), he would be in violation of this policy if his request were granted. However, the parties do not meaningfully address this issue. At times, Tate's lawyers seem to assume that Tate wants to wear a ring only while in his cell and at religious services (and thus that he would abide by the prison policy), but this is inconsistent with Tate's deposition testimony. Further, defendants do not demonstrate that the policy itself is supported by a compelling governmental interest. That is, defendants do not explain why they adopted the policy in the first place. Unless

17

defendants can demonstrate that the policy itself is supported by a compelling governmental interest, defendants cannot rely on it as a reason for prohibiting religious rings. Because of the lack of clarity on these matters, I cannot find that there is no genuine issue of material fact concerning Tate's claim for a silver ring. This claim must be tried.

### 3. Tate's Claim for a Religious Diet

Plaintiff Tate seeks to be provided with a religious diet, consisting of Halal food (food that does not contain blood, pork, pork derivatives, alcohol, or alcohol derivatives), and Halal/Zahiba meat (meat that has been slaughtered in a designated manner). Tate states that "for [him] personally . . . eating meat is a requirement of [his] religion, if the meat is halal, if it's been slaughtered in accordance with [his] religion." Tate also believes that Muslims "get blessings for eating halal meat." (Tate Dep. 24:12-16; 36:23-24.) Thus, Tate alleges that eating Halal meat is a form of religious exercise, and that he cannot engage in this form of religious exercise if he is limited to eating a vegetarian Halal diet.[6]

Defendants question the sincerity of Tate's belief that he must eat Halal meat to obtain additional blessings, and Tate admits that he sometimes eats meat that is not Halal. Thus, whether Tate sincerely believes that he must abstain from non-Halal meat and whether he sincerely believes that his religion requires that he consume some Halal meat are questions of credibility for trial.

Defendants argue that, even if Tate's belief is sincere, they are entitled to summary judgment for two other reasons. First, defendants argue that plaintiffs' claim is moot

---

[6]Although it is not clear, Tate also seems to argue that requiring him to be a vegetarian or vegan in order to comply with his religion is itself a substantial burden on his religious exercise.

18

because the DOC has recently entered into a settlement agreement in a separate lawsuit in which they agreed to provide Halal meat to inmates four times per week. Pursuant to the settlement, the DOC began serving Halal meat on June 26, 2008. Tate argues that the settlement agreement does not render his claim moot because (1) he believes that his religion requires him to eat Halal meat seven days a week (as opposed to only four times per week, as provided in the settlement agreement), and (2) the settlement agreement does not affect his claim for damages for the deprivation of Halal meat prior to June 26, 2008. I agree with Tate and find that, for these two reasons, Tate's claims regarding his religious diet are not moot.

Defendants next argue that they have compelling governmental interests that justify their refusal to serve Halal meat. However, they do not precisely identify the interests that they believe are "compelling." Defendants basically say that it would be burdensome to provide inmates with Halal meat because they cannot locate a vendor that sells single-serving, meat-containing Halal meals, and that it would be difficult to prepare Halal meals containing meat on site at each institution. Presumably, defendants plan to argue that the cost of providing Halal meat to inmates is so great that their interest in avoiding such cost is compelling. If this is so, defendants have a heavy burden to carry, as "no appellate court has ever found [that the government's interest in the orderly administration of its prison dietary system is a ] compelling interest." Koger, 523 F.3d at 800. For present purposes, however, it suffices to say that the summary judgment record does not allow me to conclude as a matter of law that the cost of providing Halal meat to inmates is so great that a complete refusal to serve such meat is the least restrictive means of furthering a

19

compelling governmental interest.  Therefore, Tate's claim regarding his religious diet must be tried.

### 4.    Tate's RLUIPA Claim Regarding Tuberculosis Testing

Tate next seeks relief in connection with his claim that his religious beliefs require that he not receive a diagnostic test for tuberculosis ("TB") that involves a subcutaneous injection of a substance containing pork.  He seeks both damages for an incident in which he was forcibly injected with the pork-based substance and an injunction requiring that he be provided with an alternative to the pork-based test in the future.

Initially, defendants question whether Tate has a sincere religious objection to the pork-based test.  Defendants point out that on some occasions Tate has submitted to the test even though he suspected that it contained pork.  However, whether Tate sincerely believes that he cannot submit to pork-based tests is a matter of credibility for trial and thus cannot be resolved at the summary judgment stage.

Regarding Tate's damages claim, he alleges that in June 2002 defendant Kathy Lemens, a nurse at Green Bay Correctional Institution, forcibly injected him with a pork-based TB test.  Defendants contend that this test did not, in fact, contain a pork substance and that therefore plaintiffs' religious exercise was not affected.  However, the record contains evidence from which a reasonable finder of fact could conclude that the test contained pork, including an email stating that the TB test "does have pork protein derivative." (Pls.' PFOF ¶ 35.)  Resolving all reasonable factual disputes in plaintiff's favor, I assume for purposes of summary judgment that the test contained pork.

Case 2:04-cv-01181-LA    Filed 03/09/09    Page 20 of 31    Document 224

Defendants next argue that Tate was not forcibly injected with the TB test but voluntarily submitted to it after he was offered a choice between submitting to the test or spending one month in the segregation unit while staff monitored his health for signs of TB. However, Tate testified at his deposition that Lemens forcibly injected him with the test. (Tate Dep. 17:7-9.)  Although Lemens swears in her affidavit that she did not inject Tate without his consent, Tate's testimony suffices to create a genuine issue of material fact as to whether Lemens conducted the test without Tate's consent.  Therefore, plaintiffs' damages claim arising out of the June 2002 incident issue must proceed to trial.[7]

In addition to his claim for damages, plaintiff requests prospective relief requiring defendants to provide him with an alternative to the pork-based test in the future. Defendants respond that they already provide inmates with such an alternative – namely, spending thirty days in the segregation unit while they are monitored for signs of TB. Plaintiff responds that this alternative also substantially burdens his religious exercise because spending one month in the segregation unit is extremely undesirable.  Inmates in segregation are generally confined to their cells for the entire day and are denied access to the dining room and exercise facilities.  I find that a reasonable finder of fact could

_____

[7]I note that defendants do not argue that the law allows them to forcibly inject an inmate with a pork-based TB test.  This is so even though some courts have held that the government may compel inmates to submit to this type of test despite the inmate's religious objection.  See generally Johnson v. Sherman, No. CIV S-04-2255, 2007 U.S. Dist. LEXIS 24098 (E.D. Cal. Apr. 2, 2007) (unpublished order holding that compelled administration of TB skin test substantially burdened inmate's exercise of his Rastafarian belief that it is sinful to take artificial substances into his body, but did not violate RLUIPA because evidence showed that test was the least restrictive means for prison officials to detect latent and active TB cases and protect inmates and staff from disease); Karolis v. New Jersey Dept. Of Corr., 935 F. Supp. 523 (N.J. 1996) (involuntary administration of TB test to Christian Scientist inmate was least restrictive means of furthering compelling state interest because other tests are less effective).

21

conclude that an inmate faced with the choice of either submitting to the test or spending one month in segregation will confront "substantial pressure . . . to modify his behavior and violate his beliefs." Koger, 523 F.3d at 799. Thus, plaintiff has raised a genuine issue of material fact as to whether defendants' alternative substantially burdens his religious exercise.

Defendants next argue that even if the choice between a pork-based TB test and one month's segregation substantially burdens plaintiff's religious exercise, they have employed the least restrictive means of furthering a compelling governmental interest. The parties agree that preventing the spread of TB among prison inmates and staff is a compelling governmental interest. However, plaintiff argues that this interest may be furthered by employing alternatives to the pork-based test that do not involve confining an inmate to segregation for one month, such as a chest x-ray or a saliva-based test. Defendants respond by arguing that plaintiff has the burden to cite expert medical testimony showing that a chest x-ray or saliva-based test would be an adequate alternative to a pork-based TB test. However, it is defendants who have the burden to show that they have used the least restrictive means of furthering their interest, 42 U.S.C. § 2000cc-1, and based on the present record, I find that a reasonable finder of fact could conclude that defendants have not carried this burden. Defendants argue that they have a policy pursuant to which saliva-based tests and chest x-rays are not considered adequate alternatives to skin-based TB tests. In order to rely on this policy, defendants must show that the policy itself is the least restrictive means of furthering a compelling governmental interest. Yet defendants do nothing more than state that they have the policy. They do

22

not show that there are no less restrictive alternatives to it. Therefore, defendants are not entitled to summary judgment on plaintiff's claim for prospective relief involving TB testing.

**B.      Free Exercise Clause**

Plaintiffs argue that, in addition to RLUIPA, defendants' actions violate the Free Exercise Clause of the First Amendment.   Under the Free Exercise Clause, a prison regulation will be upheld if it is reasonably related to a legitimate penological interest. Lindell v. Frank, 377 F.3d 655, 657 (7th Cir. 2004).  Unlike in the RLUIPA context, where defendants must demonstrate that they have employed the least restrictive means of furthering a compelling state interest, in the free exercise context, defendants need show only that the regulation serves a legitimate interest, and they need not demonstrate that they have chosen the least restrictive means of furthering their interest.   Thus, if a regulation complies with RLUIPA, it also satisfies the Free Exercise Clause.

The Supreme Court has set forth four factors to consider when examining the constitutionality of a prison regulation: "whether the regulation is rationally related to a legitimate and neutral governmental objective; whether there are alternative means of exercising the right that remain open to the inmate; what impact an accommodation of the asserted right will have on guards and other inmates; and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns."  Id. (citing Turner v. Safley, 482 U.S. 78, 89-91 (1987)).

At the present time, I find that it would be imprudent to further discuss plaintiffs' free exercise claims.  In all likelihood, resolution of plaintiffs' RLUIPA claims will also resolve their free exercise claims.  If plaintiffs prevail on their RLUIPA claims, the free exercise

23

claims will likely be moot because the remedies available under the Free Exercise Clause and RLUIPA would likely be the same. Likewise, if plaintiffs lose their RLUIPA claims, they will almost certainly lose their free exercise claims as well, inasmuch as defendants have a much lighter burden to carry in connection with the free exercise claims. Thus, depending on what happens at trial, the court may not need to adjudicate plaintiffs' constitutional claims at all. And because "'federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions,'" Koger, 523 F.3d at 801, I will not address plaintiffs' free exercise claims at this juncture.

In any event, many of the key facts relating to plaintiffs' free exercise claims – including the facts needed to apply the Turner factors discussed above – are heavily disputed. I therefore cannot make any meaningful summary judgment rulings with respect to such claims.

**C.      Equal Protection Clause**

The parties stipulated to the dismissal of plaintiffs' equal protection claims on May 14, 2008. (Docket No. 179.) Accordingly, these claims are no longer at issue.

**D.      Dismissal of Certain Defendants**

**1.      Dawson and Jackson**

Defendants seek the dismissal of defendants Gene Dawson and Larry Jackson due to plaintiffs' failure to allege that they had any involvement in plaintiffs' requests for religious property or practices. Plaintiffs oppose the dismissal of these defendants, stating that both Dawson and Jackson were chaplains at Columbia Correctional Institution during

24

Perez's incarceration there. However, holding the position of chaplain at an institution is not itself unlawful, and Perez has not identified any specific actions taken by either Dawson or Jackson that could be deemed a violation of his rights. Therefore, Dawson and Jackson will be dismissed as defendants.

### 2. Frank, Litscher, Raemisch, Casperson, Verhagen, Robson, and Risser

Defendants seek the dismissal of these individuals because none of them were involved in granting or denying religious requests. Plaintiffs argue that these defendants are properly included because they all play a role in revising or creating DOC policy.

Rick Raemisch, the current Secretary of the DOC, will not be dismissed because plaintiffs seek injunctive relief with regard to current DOC policy. The extent to which defendants Matthew Frank, Jon Litscher, Steve Casperson, Dick Verhagen, Judy Robson, and Fred Risser were personally involved in creating or executing the specific policies that plaintiffs challenge is not clear. However, all of these individuals appear to have held policy-making positions during at least part of the time period at issue in this case. Thus, they may be liable for damages should Tate (the only plaintiff seeking damages) establish that any of their policies were responsible for a deprivation of his rights. As discussed below, further proceedings are necessary in connection with Tate's damages claim, and therefore I will defer ruling on whether these individuals should be dismissed until I resolve the other outstanding issues with respect to Tate's damages.

### 3. Hautamaki, O'Donnell, Grams, Noland, and Bruns

Defendants seek the dismissal of five individuals (Sandra Hautamaki, Cindy O'Donnel, Greg Grams, Phil Noland, and Wendy Bruns) who made recommendations on

the disposition of plaintiffs' inmate complaints.  Plaintiffs contend that all five individuals

were involved in the decision to deny plaintiffs' requests for religious property, and that

defendant Bruns was aware that the tuberculosis test administered in June 2002 contained

a pork derivative.  Defendants submit that these five defendants are entitled to absolute

immunity and should be dismissed under the reasoning of Koutnik v. Brown, 351 F. Supp.

2d 871, 876-77 (W.D. Wis. 2004), in which the court concluded that "persons making

recommendations for the disposition of inmate complaints are entitled to absolute

immunity."  However, the author of that decision, United States District Judge Barbara

Crabb, later reversed her position:

> I concluded that inmate complaint review officers were entitled to absolute
> immunity because, like other prison officials who are granted absolute
> immunity, they performed adjudicatory tasks, such as rejecting unmeritorious
> and untimely complaints.  However, in reconsidering the question in
> connection with this lawsuit, I have decided that the earlier holding cannot
> stand.

Lindell v. O'Donnell, No. 05-C-04-C, 2005 WL 2740999 *14 (W.D. Wis. Oct. 21, 2005).

Judge Crabb explained,

> [O]fficers within the inmate complaint review system serve as both fact-
> gatherers and fact-finders.  They investigate charges of wrongdoing on the
> part of their colleagues and recommend or issue decisions on those charges.
> Their decisions are made without the baseline of an adversarial process, and
> within an environment that is not impartial or insulated from workplace
> pressure.  Although some similarities may exist between inmate complaint
> review officers and judicial officers, I find that these officials fail to meet the
> prevailing standard for absolute immunity as set forth in Cleavinger.

Id. at *15 (referring to Cleavinger v. Saxner, 474 U.S. 193 (1985), in which the Supreme

Court held that prison officials serving on inmate disciplinary review boards are not entitled

to absolute immunity).  Based on this reasoning, I cannot conclude that inmate complaint

26

examiners are entitled to absolute immunity, and I decline to dismiss these defendants on that basis.[8]

### 4. Boatwright and Beyah

Defendants seek the dismissal of Ana Boatwright on the grounds that she did not become the DOC Division of Adult Institutions Policy Advisor until after plaintiffs' claims arose. Plaintiffs contend that defendant Boatwright was the acting policy advisor at the time their claims arose, and defendants do not respond to this contention. For this reason, I cannot dismiss defendant Boatwright

Defendants also seek the dismissal of Ron Beyah because, they claim, he did not directly approve or disapprove any of plaintiffs' religious requests. Plaintiffs point out that defendant Beyah was the only Muslim chaplain in the DOC when their claims arose, and that various defendants testified that they turned to him to make religious determinations and recommendations. It is not clear whether plaintiffs mean to argue that Beyah was the governmental official who actually made the determination as to whether plaintiffs' religious requests would be granted, or whether Beyah merely gave advice to other officials about the centrality of certain religious requests to the practice of Islam. If Beyah did nothing more than give advice to other decision-making officials, he would have no liability and would be dismissed as a defendant. However, plaintiffs appear to argue, with some support in the record, that Beyah was the de facto decision-maker with respect to religious requests made by Muslims. Based on this evidence, I find that there is a genuine issue

---

[8]In their reply brief, defendants argue that these defendants should be dismissed for the additional reason that plaintiffs have not established any potential liability on their part. However, I will not consider arguments made for the first time in a reply brief.

of material fact as to whether Beyah actually made decisions with respect to plaintiffs' requests, and that therefore Beyah cannot be dismissed at this time.

### 5. Endicott and Wess

Plaintiffs state that they do not object to the dismissal of defendants Jeffrey Endicott and Sally Wess. Accordingly, defendants Endicott and Wess are dismissed.

### E. Tate's Claim for Monetary Damages

In their summary judgment briefs, plaintiffs' attorneys stated that plaintiffs seek only declaratory and injunctive relief, not damages. However, on July 15, 2008, plaintiff Tate filed a pro se motion stating that he objects to his attorneys' assertion that he does not seek damages, and that he does in fact seek nominal and punitive damages.[9] Plaintiff Perez agrees with his lawyers and does not seek damages. After Tate filed his objection, Tate's lawyers filed a motion to withdraw, stating that they and their client have reached an impasse regarding the issue of damages. In briefing the pending motions for summary judgment, Tate's counsel filed briefs regarding Tate's claims for prospective relief, while Tate filed separate briefs regarding his claim for damages. However, defendants responded only to Tate's counsel's arguments and did not address Tate's pro se arguments.

Because defendants have not responded to Tate's pro se arguments, I do not have the benefit of briefing by defendants on Tate's entitlement to nominal or punitive damages. Further, although defendants made some minimal arguments in their briefs concerning

---

[9]Tate cannot recover compensatory damages because he has suffered no economic loss and the Prison Litigation Reform Act prevents him from recovering damages for mental or emotional harm unless he also suffered a physical injury. 42 U.S.C. § 1997e(e). Tate does not argue that any of defendants' actions resulted in physical injury.

28

qualified immunity, those arguments are very conclusory and largely unhelpful.  In light of these problems, I find that the most efficient way to address Tate's damages claim is to hold a telephonic status conference and, if necessary, set a briefing schedule regarding any issues concerning damages that need to be resolved prior to trial.  Both Tate and his attorneys will be included in the call.

I will take this opportunity to advise Tate that, based on my review of the record, it is likely that even if he prevails on his claims and overcomes defendants' qualified immunity defense, the most he will recover is one dollar in nominal damages.  No evidence in the record of which I am aware would allow a finder of fact to award punitive damages.  Punitive damages may be awarded only when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Alexander v. City of Milwaukee, 474 F.3d 437, 453 (7th Cir. 2007) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  Although Tate believes that defendants were motivated by racism or hostility towards Muslims, I have seen no evidence that supports his belief, and Tate's own speculation that defendants were so motivated is not admissible evidence.  Thus, because Tate will likely not be able to recover punitive damages, he will be limited to recovering nominal damages.  Nominal damages cannot exceed one dollar.  See, e.g., Carey v. Piphus, 435 U.S. 247, 267 (1978).

Because the most Tate will likely be able to recover is one dollar, he may want to reconsider his demand for damages.  If plaintiff does not request damages, the court can provide him with a trial date in the next few months.  However, if he insists on pursuing his claim for damages, the trial will need to be postponed to allow more briefs to be filed and to allow the court additional time to deal with the issues raised in those briefs.  Additionally,

should the court rule that defendants are not entitled to qualified immunity, defendants might file an interlocutory appeal of my ruling, which would add further delay. Tate may decide that the potential recovery of one dollar is not worth delaying the trial date. However, the choice is his, and therefore the court will schedule a telephonic status conference to determine the next steps in this case.

In the meantime, counsel's motion to withdraw will be denied without prejudice. If after the conference it appears that Tate and his counsel cannot resolve their differences, the court will reconsider whether his lawyers should be allowed to withdraw and Tate permitted to proceed pro se. Under no circumstances will the court find new counsel for Tate. The court has limited resources and cannot afford to recruit more than one attorney for a pro se civil litigant.

### III. CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment (Docket #181) is **GRANTED-IN-PART** insofar as it seeks summary judgment in favor of defendants Dawson, Jackson, Endicott and West. In all other respects, the motion is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment (Docket # 189) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff Tate's motion to renew objections (Docket # 214) is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Attorney Dvorak's motion to withdraw (Docket # 200) is **DENIED WITHOUT PREJUDICE**.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **March 25, 2009 at 2:00 p.m.** to schedule further proceedings. The court will initiate the call and will include all counsel as well as plaintiff Tate.

Dated at Milwaukee, Wisconsin, this 9 day of March, 2009.

/s_____
LYNN ADELMAN
District Judge